AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
09/15/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
September 15, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MR___ DEPUTY

United States of America

v.

JERMAINE EGGLESTON,

Defendant

Case No. 2:20-mj-04366

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 14, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
Complainant's signature

MICHAEL WOODARD, DEA TFO
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 9/15/2020

[signature]
Judge's signature

City and state: Los Angeles, California

HON. PEDRO V. CASTILLO,
U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Michael Woodard, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against JERMAINE EGGLESTON ("EGGLESTON") for a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A): Possession with Intent to Distribute Fentanyl.

2. This affidavit is also made in support of an application for a warrant to search an Apple i-Phone mobile device (the "SUBJECT DEVICE"), in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a Task Force Officer ("TFO") with the DEA Los Angeles Field Division, Los Angeles International Airport ("LAX") Narcotics Enforcement Task Force ("LAXNTF"), and am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in Title 18, United States Code, Section 2516. I have been a DEA TFO since 2012.

6. I have been employed by the Los Angeles Airport Police Department ("LAXPD") as a Detective since 2003. My formal narcotics training began in 2003 at the Rio Hondo Police Academy where I received several basic blocks of instruction in narcotic identification, recognition and related drug laws. During this instruction, I had an opportunity to view packaging techniques used for street and major level drug sales. I have attended LAPD's basic narcotics school and attended multiple training seminars given by the California Narcotics Officers Association and the International Narcotics Interdiction Association.

7. I have also participated in a variety of narcotics investigations ranging in complexity from simple possession to complex conspiracies. I have arrested and interviewed subjects, executed search warrants, conducted physical surveillances,

2

utilized electronic and video surveillance, spoken to informants, suspects, and other experienced narcotics investigators concerning the methods and practices utilized by narcotics traffickers.  I have testified in state and federal court.  Prior to my law enforcement career, I spent approximately 12 years with American Airlines.  I have worked in and around the commercial aviation environment for over 30 years.

8. As a TFO with the DEA, I primarily investigate mid-level and large scale drug trafficking and money laundering organizations.  I have participated in numerous narcotics investigations as a case agent and in a subsidiary role.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I am familiar with the methods of operation that narcotics traffickers utilize, including the distribution, storage, and transportation of narcotics and the collection of narcotic related proceeds from drug trafficking and various methods of money laundering used to conceal the nature of the proceeds.  Additionally, I have participated in many aspects of drug investigations alongside senior, experienced special agents and TFOs.  These investigations have involved unlawful importation, exportation, possession with intent to distribute and distribution of drugs, laundering of drug proceeds and monetary instruments derived from drug activities and conspiracies associated with drug offenses.

9. Based on my training and experience, I am familiar with the methods of operation used by people who distribute controlled substances, including the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

### III. SUMMARY OF PROBABLE CAUSE

10. On or about September 14, 2020, Transportation Security Administration ("TSA") officers at LAX found approximately 3.34 kilograms of fentanyl inside EGGLESTON's checked bag. EGGLESTON was scheduled to take Spirit Airlines flight #956, which was traveling from LAX to New Orleans, Louisiana. Following the discovery of the narcotics by law enforcement, EGGLESTON was detained at the gate while waiting to board his flight and the SUBJECT DEVICE was seized from him.

### IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

**A.  TSA Agents Discovered Drugs in EGGLESTON's Checked Bag**

12. On September 14, 2020, at approximately 11:15 a.m., TSA Officer Gerardo Martinez was screening checked luggage at the LAX Terminal 5 baggage room. A screening machine identified a suspicious bulk mass inside a black Nautica duffel bag and altered TSA Officer Martinez.

13. Based on TSA procedures and protocol, TSA Officer Martinez conducted a manual search of the bag and discovered

4

three solid bricks of an unknown substance, each wrapped in plastic and tape, and placed inside a computer keyboard box. TSA Officer Martinez notified TSA Officer Smythe, an explosive detection officer, for further inspection.  TSA Officer Smythe arrived on the scene and cleared the items as nonexplosive. LAXPD was then notified.

    14.  LAXPD Officer Daniel Choi arrived at the TSA luggage screening area.  Officer Choi observed the black Nautica duffel bag.  Attached to the bag was a Spirit Airlines luggage tag bearing EGGLESTON's name and Spirit Airlines flight 956 from LAX to New Orleans, Louisiana.  Officer Choi notified LAXPD Sergeant Chow of the suspicious bag checked under the name of EGGLESTON. Officer Choi separately notified me of the situation and that flight 956 was departing from gate 56C.

    15.  Uniformed LAXPD Officers Mainwaring and Nugent, DEA Special Agent Davis King, and I responded to the gate 56C area to look for EGGLESTON.  I located EGGLESTON standing in line to board the flight to New Orleans.  SA King and I identified ourselves as law enforcement agents with the DEA.  I asked EGGLESTON if he was JERMAINE EGGLESTON and he said "Yes." EGGLESTON provided us with photo identification that confirmed it was in fact EGGLESTON.  I advised EGGLESTON that we wanted to ask him some questions about his flight to New Orleans and he agreed to speak with us.

    16.  EGGLESTON stated that he had a one-way ticket to fly to New Orleans but that he was actually from Houston, Texas. EGGLESTON stated that he had been visiting Los Angeles since

5

September 10, 2020.  I asked EGGLESTON if he had checked any luggage.  EGGLESTON stated that he had not.  I asked him again and he restated that he did not check any luggage.  When I asked a third time if he was sure, he stated that he did in fact check one bag.

17.  We asked EGGLESTON if he packed the bag himself and he stated that he and his "homie" packed the bag.  When asked for his friend's name, EGGLESTON declined to provide it.  EGGLESTON was advised that possible narcotics were located inside his checked bag and that he was being detained for further investigation.

18.  EGGLESTON's backpack and the SUBJECT DEVICE were seized and transported to the LAXNTF office for further investigation.

**B.   The Three Bricks in EGGLESTON's Bag Tested Positive for Fentanyl**

19.  SA King and LAXPD Officer Choi transported the black Nautica duffel bag and suspected narcotics to the LAXNTF office.

20.  At the LAXNTF office, I tested the substance in one of the three bricks found in EGGLESTON's bag, utilizing a TruNarc Raman spectrometer.  The substance I tested was positive for fentanyl.  The gross weight of all three bricks is approximately 3.34 kilograms.

21.  While at the LAXNTF office, I read EGGLESTON his Miranda rights.  EGGLESTON invoked his rights and made no statements.

6

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Los Angeles is a major hub for illegal drug distribution. Partly because of the close proximity of Los Angeles to the Mexican border, prices of drugs are generally lower here than prices on the east coast. Drugs enter Los Angeles from across the Mexican border or overseas from Asia and are then distributed across the country. LAX is commonly used to facilitate drug transportation for drug trafficking organizations, who send their couriers through LAX with drugs in their luggage. Numerous drug arrests are made at LAX every year, with couriers transporting drugs in checked bags.

    b. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    c. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

d.  Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

e.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on

their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

   f. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device" includes the SUBJECT DEVICE.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

       a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

       b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

      a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.

      c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress EGGLESTON's thumb- and/or fingers on the device; and (2) hold the device in front of EGGLESTON's face

12

with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

28. For all of the reasons described above, there is probable cause to believe that EGGLESTON has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A): Possession with Intent to Distribute Fentanyl, and that evidence of the Subject Offenses as described in Attachment B will be found on the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 15th day of
September, 2 2

_____
THE HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE